UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| ANDREW YOUNG JOHNSON, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No. 3:22-CV-011-RLJ-DCP |
| DUSTIN BOULDIN,[1] DAVID PATTERSON, SHAWN PHILLIPS, VELMA BARNETTE, JOHN WHITE, RUSSELL KOCH, and NICOLE SIEMS, | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

Plaintiff, a prisoner of the Tennessee Department of Correction ("TDOC"), has filed a pro se complaint for violation of 42 U.S.C. § 1983 challenging various events during his confinement. For the reasons set forth below, this action will proceed only as to Plaintiff's claim that Defendant Unit Manager Siems denied his request to be moved to a new unit despite knowing that inmates in his unit had labeled him as a "snitch" and threatened and verbally abused him, and all other claims will be **DISMISSED**, as they fail to state a claim upon which relief may be granted under §1983.

### I. SCREENING STANDARD

Under the Prison Litigation Reform Act ("PLRA"), district courts must screen prisoner complaints and shall, at any time, *sua sponte* dismiss any claims that are frivolous or malicious, fail to state a claim for relief, or are against a defendant who is immune. *See, e.g.,* 28 U.S.C. §§ 1915(e)(2)(B) and 1915A; *Benson v. O'Brian*, 179 F.3d 1014 (6th Cir. 1999). The dismissal

---

[1] Plaintiff filed a motion to correct the record indicating that the name of this Defendant is Dustin Bouldin, rather than David Bouldin, as he had initially named this Defendant in his complaint [Doc. 4]. For good cause shown therein, this motion [*Id.*] will be **GRANTED** to the extent that the Clerk will be **DIRECTED** to correct this Defendant's name on the Court's docket.

standard that the Supreme Court set forth in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) "governs dismissals for failure state a claim under [28 U.S.C. §§ 1915(e)(2)(B) and 1915A] because the relevant statutory language tracks the language in Rule 12(b)(6)." *Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010). Thus, to survive an initial review under the PLRA, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

Formulaic and conclusory recitations of the elements of a claim do not state a plausible claim for relief. *Id.* at 681. Likewise, an allegation that does not raise a plaintiff's right to relief "above a speculative level" fails to state a claim upon which relief may be granted. *Twombly*, 550 U.S. at 570. However, courts liberally construe pro se pleadings and hold them to a less stringent standard than lawyer-drafted pleadings. *Haines v. Kerner*, 404 U.S. 519, 520 (1972).

A claim for violation of 42 U.S.C. § 1983 requires a plaintiff to establish that a person acting under color of state law deprived him a federal right. 42 U.S.C. § 1983.

II.     COMPLAINT ALLEGATIONS

On July 25, 2021, members of the Aryan Nation white supremacy group forced Inmate Justin Harrison ("Inmate Harrison"), who is white, to hit Inmate Antonio Forrest ("Inmate Forrest"), who is black, in the face while Inmate Forrest was playing cards [Doc. 1 p. 3–4]. Inmate Forrest then "jumped up and grabbed [I]nmate Harrison" [*Id.* at 4]. After Plaintiff broke up this fight, black inmates in the unit began yelling [*Id.*]. Plaintiff told the black inmates that it was an isolated incident, rather than a black and white issue, and that it was over [*Id.*]. But Inmate Forrest was upset and said that "it wasn't over, that he was going to get [I]nmate Harrison," at which point the Aryan Nation stated that it "st[ood] with [Inmate Harrison]" [*Id.*]. "The racial tension in the

unit was high and [Plaintiff] did everything [he] could to divert the attention from race," and other inmates likewise did so [*Id.*].

But at some unspecified point after this first altercation, Inmate Forrest and Inmate Peoples, who is also black, started fighting [*Id.*]. Plaintiff does not know what started this altercation, but he broke it up "once [he saw] them wrestling" [*Id.*]. According to Plaintiff, "[t]he whole incident lasted about an hour and a half to two hours," and no staff was present, nor did any "staff make their required thirty-minute walk through" [*Id.*].

After they viewed the unit surveillance video, prison officials placed all three black inmates involved in the second altercation, specifically Inmate Forrest, Inmate Peoples, and Plaintiff, in segregation pending investigation [*Id.*]. On July 28, 2021, Defendants Bouldin and Patterson interviewed these inmates [*Id.* at 4]. During his interview, Plaintiff told these Defendants that "[he] only got involved to prevent a race war" [*Id.* at 4–5]. Plaintiff also "slipped up and said '[he] couldn't stand there and watch them stab him ([I]nmate Forrest) and hit him in the head with a fan motor'" [*Id.* at 5].

On July 30, 2021, Defendants Bouldin and Patterson charged Plaintiff, Inmate Forrest, and Inmate Peoples with "participating in gang activity" based on the premise that Plaintiff and Inmate Peoples had "served a gang violation on [I]nmate Forrest," which caused Plaintiff and Inmate Peoples also to be charged with assault on an offender [*Id.*]. But jail officials did not charge Inmate Harrison and the Aryan Nation inmates for their actions on July 25, 2021, nor did they place these inmates in segregation [*Id.*].

On August 2, 2021, Inmate Forrest told Defendant Bouldin that the incident on July 25, 2021, was not a gang violation, that Inmate Harrison had attacked him while he was playing cards, and that Defendant Bouldin needed to view the entire surveillance video [*Id.*]. Also, on an

3

unspecified date, Plaintiff spoke to Defendant Warden Shawn Phillips and asked him to view the entire video to see that he did not assault Inmate Forrest but instead broke up the fights, and Plaintiff told this Defendant that the "video would prove that similarly situated inmates were treated differently" [*Id.* at 5]. Defendant Warden Phillips "said he would look into it" but never corrected Defendants Patterson and Bouldin's "discriminatory actions" [*Id.* at 6].

On September 14, 2021, Defendant Bouldin testified at Plaintiff's disciplinary hearing that he reviewed the video, saw Inmate Harrison hit Inmate Forrest while Inmate Forrest was playing cards, and saw Plaintiff break up that fight but did not charge the white inmates as he had charged Plaintiff, Inmate Forrest, and Inmate Peoples [*Id.* at 5–6]. And Defendant Sgt. Barnette, who is the head of the Department of Internal Affairs and the supervisor of Defendants Bouldin and Patterson, stated that only inmates involved in the altercation "'were placed on pending investigation,'" and that race did not play a part in that decision [*Id.* at 6]. But Plaintiff claims that this directly contradicts Defendant Bouldin's testimony [*Id.*]. Plaintiff also claims that on September 17, 2021, Defendant Sgt. Barnette told him that she did not believe that he was a Vice Lord but still "refused to compel her agents to charge any of the white inmates" [*Id.*].

Also, during the investigation into Plaintiff's grievance for violation of Title VI of the Civil Rights Act of 1964 ("Title VI"),[2] Defendant Counselor White was supposed to interview Plaintiff but instead "hindered and interfered with the investigation into [Plaintiff's] discrimination claim by falsifying [TDOC] documents" and stating that on August 26, 2021, "he held an in-person interview with [Plaintiff] and [Plaintiff] did not have anything to add" [*Id.* at 6–7]. Plaintiff also

---

[2] Plaintiff generally refers to a Title VI complaint he filed with TDOC [Doc. 1 p. 6–7]. The Court construes these allegations to assert that Plaintiff filed a Title VI grievance in accordance with TDOC policies # 103.10 (https://www.tn.gov/content/dam/tn/correction/documents/103-10.pdf) and # 501.01 VI.(K) (https://www.tn.gov/content/dam/tn/correction/documents/501-01.pdf) (both websites last visited Mar. 28, 2022).

4

states that when Defendant White was assigned as Plaintiff's staff advisor for his disciplinary hearing, he "retaliated against [Plaintiff]" by refusing to help Plaintiff and speaking against him at his hearing, and generally claims that this was due to Plaintiff "engaging in protected speech" [*Id.*].

Plaintiff next claims that on October 28, 2021, he told Defendant Russell Koch, who is "the teacher over the law library," that he needed a notary to file a "writ of certiorar[i]," and showed this Defendant his complaint and gave him a request for legal materials [*Id.*]. Defendant Koch told Plaintiff he would get a notary to see him and bring him legal materials on October 31, 2021 [*Id.*]. But Plaintiff did not receive any legal materials until he filed a grievance alleging that Defendant Koch had retaliated against him, and did not get a notary until November 8, 2021, when a mailroom officer called the notary [*Id.*].

Also, between October 28, 2021, and December 19, 2021, Plaintiff received only five cases on December 3, 2021, and five cases on December 10, 2021, even though on September 14, 2021, Defendant Unit Manager Siems approved all inmates in Unit 21 to receive copies of legal work after they filled out a withdrawal form paying for them [*Id.* at 7]. And on November 19, 2021, after she spoke with Defendant Koch, Defendant Siems told Plaintiff he could not use that process and instead had to get his copies from the law library, even though she knew Plaintiff was on lockdown and having trouble with the library coming see him [*Id.* at 7–8].

Additionally, on October 28, 2021, Plaintiff told Defendant Siems that other inmates had labeled him a snitch and subjected him to verbal abuse and threats because this Defendant "fired the 21B Rockman (inmate unit worker)" and stated that she will not hire a new one "due to [Plaintiff] filing a grievance," and he therefore asked to be moved to a different unit, but that request was denied [*Id.* at 8]. And, on December 16, 2021, Defendant Siems tried to move "a crip" into Plaintiff's cell even after that inmate told her staff "that [the "crip" inmate and Plaintiff] did

5

not get along and there would be problems" if that occurred, and this inmate refused the move under the threat of a write up [*Id.*]. Plaintiff generally claims that the actions of Defendants Siems and Koch were "done for retaliatory reasons and not for a legitimate correctional purpose" [*Id.*].

Plaintiff then states that "the actions and inactions" of all Defendants except Defendant Koch amount to "disregard to risk that is excessive and poses a substantial risk of harm to [his] safety and security" [*Id.*]. Plaintiff has sued Cpl. Dustin Bouldin, Cpl. David Patterson, Warden Shawn Phillips, Sgt. Velma Barnette, Counselor John White, Teacher Russell Koch, and Unit Manager Nicole Siems [*Id.* at 1, 3]. As relief, Plaintiff requests that the Court issue several injunctions, including (1) an injunction requiring Defendant Warden Phillips to expunge his disciplinary convictions and remove his security threat group designation from his institutional record, (2) an injunction requiring Defendant Warden Phillips to grant him law library access in accordance with TDOC policy, and (3) an injunction ordering "all Defendants to cease and desist all retaliatory actions" [*Id.* at 9]. Plaintiff also requests "any such relief as it may appear that [he] is entitled" [*Id.*].

### III. ANALYSIS

For the reasons set forth below, Plaintiff's complaint fails to state a claim upon which relief may be granted under § 1983, except as to his claim that Defendant Siems failed to protect him from a substantial risk of harm from inmates in his unit.

#### A. Defendants Bouldin, Patterson, Phillips, and Barnette

As set forth above, Plaintiff claims that Defendants Bouldin and Patterson charged three black inmates, specifically Plaintiff, Inmate Peoples, and Inmate Forrest, for their actions in an altercation between Inmate Forrest and Inmate Peoples but did not charge white inmates involved in an altercation that occurred between Inmate Harrison and Inmate Forrest, that this was disparate

6

treatment of similarly situated inmates, and that Defendants Warden Phillips and Sgt. Barnette failed to remedy these discriminatory actions. The Court liberally construes these allegations to seek to assert a claim for violation of Plaintiff's right to Equal Protection.

The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. For a complaint to state a claim for violation of the Equal Protection Clause, it must allege that the plaintiff has been treated differently than other similarly situated individuals. *Ctr. For Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (providing that, in order to state a viable equal protection claim, "a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis'" and that the "'threshold element of an equal protection claim is disparate treatment'" (quoting *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 299 (6th Cir. 2006) and *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006)); *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (noting that the Equal Protection Clause "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike").

First, Plaintiff seeks to hold Defendants Warden Phillips and Sgt. Barnette liable for this claim because he complained to them about Defendants Bouldin and Patterson treating black inmates more harshly than white inmates, and they did not remedy that injustice. But as Plaintiff does not allege that either of these Defendants was personally involved in any violation of his constitutional rights and instead alleges only that these Defendants failed to resolve his complaint about Defendants Bouldin and Patterson's actions, he fails to state a claim for violation of Equal Protection as to Defendants Warden Phillips and Sgt. Barnette. *Frazier v. Michigan*, 41 F. App'x

7

762, 764 (6th Cir. 2002) (providing that "a complaint must allege that the defendants were personally involved in the alleged deprivation of federal rights" to state a claim upon which relief may be granted); *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (finding that knowledge of a prisoner's grievance and a failure to respond or remedy the complaint was insufficient to impose liability on supervisory personnel under § 1983). Thus, these Defendants will be **DISMISSED**.

Also, Plaintiff's allegations that Defendants Bouldin and Patterson disciplined Plaintiff, Inmate Peoples, and Inmate Forrest but not the white inmates involved in the first altercation do not state a plausible claim for violation of Plaintiffs right to Equal Protection. As set forth above, Plaintiff alleges that inmates associated with "the white supremacy group Aryan Nation" forced Inmate Harrison to hit Inmate Forrest in the face while Inmate Forrest was playing cards, that Inmate Forrest then grabbed Inmate Harrison, and that Plaintiff broke up this fight [Doc. 1 p. 3–4]. According to Plaintiff, racial tensions in the unit were high after this event, and, at some unspecified point during the next one to two hours, Inmate Forrest and Inmate Peoples, who are both black, began fighting for a reason Plaintiff does not know, and Plaintiff broke up this fight after he noticed Inmate Forrest and Inmate Peoples "wrestling" [*Id.* at 4]. Subsequently, Plaintiff, Inmate Forrest, and Inmate Peoples were placed in restrictive housing "pending investigation," and Defendants Bouldin and Patterson interviewed these three inmates, at which time Plaintiff "slipped up and said 'I couldn't stand there and watch them stab him ([I]nmate Forrest) and hit him in the head with a fan motor'" [*Id.* at 4–5]. Plaintiff further asserts that Defendant Sgt. Barnette stated at his disciplinary hearing that the only inmates disciplined for the relevant incident were those involved, and that inmates were not treated differently due to race [*Id.* at 6].

Thus, while Plaintiff appears to imply that the first and second altercations were related, he also (1) states that the two incidents occurred over a time period of up to two hours; (2) states

8

that he does not know why the second altercation began; and (3) provides no facts to support an assertion that the two altercations were related. And it is apparent from the totality of the complaint that the second altercation in which Plaintiff, Inmate Forrest, and Inmate Peoples were involved was the one that led to Defendants Patterson and Bouldin taking disciplinary action against these three inmates. It is further apparent that, contrary to Plaintiff's allegation that the decision to discipline inmates involved in the first altercation but not the second amounted to disparate treatment of similarly situated inmates, the second altercation between Inmate Forrest and Inmate Peoples involved use of a fan motor and a potential stabbing, and therefore was much more serious and potentially harmful than Inmate Harrison's alleged hit to Inmate Forrest's face and Inmate Forrest's resulting act of "grabbing" Inmate Harrison.

But even if the Court disregards the apparent differences in the severity of these two altercations, as Plaintiff alleges that his only involvement in both was to break them up and that he told Defendant Warden Phillips that a the entire video of the unit events "would prove that similarly situated inmates were being treated differently," Plaintiff does not set forth any facts that allow the Court to plausibly infer that Defendant Bouldin or Patterson treated an inmate of a different race than Plaintiff, who broke up the fights or who was otherwise similarly situated to Plaintiff in all relevant respects with regard to the altercations, differently than Plaintiff.[3]

Thus, Plaintiff's complaint fails to state an Equal Protection claim upon which relief may be granted under §1983 against Defendants Warden Phillips, Sgt. Barnette, Bouldin, and Patterson, and they will be **DISMISSED**.

---

[3] Moreover, even if the Court could liberally construe the complaint to allege that any Defendant did not discipline any white inmate who instigated the first altercation, who at least arguably would be "similarly situated" to any black inmate who instigated the second altercation and was disciplined, Plaintiff denies knowing why the second fight started. Thus, Plaintiff clearly did not instigate the second fight, and he lacks standing to assert the constitutional rights of other inmates. *Newsom v Norris*, 888 F.2d 371, 381 (6th Cir. 1989).

9

### B. Defendant White

As set forth above, Plaintiff alleges that Defendant White falsely stated that he interviewed Plaintiff regarding his Title VI grievance and Plaintiff had stated he had nothing to add [*Id.* at 6–7]. Plaintiff also claims that when this Defendant was his staff advisor for his disciplinary hearing, he retaliated against Plaintiff for protected conduct by refusing to assist him and speaking against him [*Id.* at 7]. The Court will address these allegations in turn based on their substance.

#### 1. Grievance

First, Plaintiff's allegation that this Defendant interfered with his Title VI grievance fails to allege a constitutional violation, as he did not have a constitutional right an effective grievance procedure. *Argue v. Hofmeyer,* 80 F. App'x 427, 430 (6th Cir. 2003); *Hailey v. Singleton*, No. 1:20-CV-039, 2020 WL 4042907, at *8 (M.D. Tenn. July 17, 2020) (citations omitted).

#### 2. Due Process

Next, the Court liberally construes Plaintiff's allegations that Defendant White did not assist him as his staff advisor in his disciplinary hearing and instead spoke against him at that hearing to allege a violation of Plaintiff's right to due process. But Plaintiff does not set forth any facts from which the Court can plausibly infer that he had a protected liberty interest at stake in that disciplinary hearing, as required for him to have had right to due process in that proceeding. *Sandin v. Connor*, 515 U.S. 472, 486–87 (1995) (holding that a prisoner is entitled to due process only when a sanction "will inevitably affect the duration of his sentence" or imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life").

#### 3. Retaliation

Lastly, Plaintiff's allegations that Defendant White did not adequately represent him at his disciplinary hearing but instead spoke against him at that hearing, and that this was retaliation for

10

Case 3:22-cv-00011-RLJ-DCP   Document 7   Filed 03/30/22   Page 10 of 17   PageID #: 28

Plaintiff's unspecified protected conduct [*Id.* at 6–7], appear to seek to assert a claim for retaliation. Such a claim requires Plaintiff to demonstrate that (1) he "engaged in protected conduct; (2) an adverse action was taken against [him] that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two – that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). However, while Plaintiff alleges that Defendant White's actions amounted to retaliation against him for protected conduct, he does not provide any facts to support these formulaic conclusions, which fail to state a plausible retaliation claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) (providing that formulaic and conclusory recitations of the elements of a claim do not state a plausible claim for relief).

As such, Plaintiff's complaint likewise fails to state a claim upon which relief may be granted under § 1983 as to Defendant White, and this Defendant will be **DISMISSED**.

### C. Defendant Koch

As set forth above, Plaintiff claims that Defendant Koch did not promptly provide him legal materials and notary services, and that these actions were retaliatory. The Court will address these allegations in turn.

#### 1. Denial of Access to Courts

First, the Court liberally construes Plaintiff's allegation that Defendant Koch did not promptly provide him legal materials and notary services to seek relief for denial of access of courts. However, as Plaintiff does not indicate that any act or omission of Defendant Koch prejudiced his ability to pursue a non-frivolous legal matter, these allegations do not state a plausible claim for denial of access to the courts. *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996) (citing *Lewis v. Casey*, 518 U.S. 343 (1996)) (holding that a plaintiff must plead and prove

that his meritorious claims have been prejudiced by the alleged denial of access to the courts to state a claim for denial of access to courts).

> 2. **Retaliation**

Plaintiff also states that Defendant Koch's acts and omissions were retaliatory [*Id.* at 9]. Plaintiff does not specify his factual basis for this claim. But as set forth above, Plaintiff does allege that after he requested legal materials and notary services from this Defendant on October 28, 2021, he did not receive the legal materials until after he filed a grievance against this Defendant for unspecified acts of retaliation and did not see a notary until November 8, 2021, when someone from the mail room obtained that service for Plaintiff [*Id.* at 7]. Plaintiff also alleges that between that October 28, 2021, and December 19, 2021, he (1) received only five cases on two separate occasions in December, and (2) was told by Defendant Siems (after she spoke with Defendant Koch) that he could no longer get legal copies by filling out a withdrawal form and instead had to get them from the law library [*Id.* at 7–8]. As set forth above, a retaliation claim requires Plaintiff to demonstrate that (1) he "engaged in protected conduct; (2) an adverse action was taken against [him] that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two – that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X*, 175 F.3d at 394.

But while filing a grievance is protected conduct, Plaintiff does not allege or set forth any facts from which the Court can plausibly infer that any of Defendant Koch's acts or omissions were due to Plaintiff filing a grievance, or that those acts or omissions would have deterred a person of ordinary firmness from continuing to file grievances.

12

Thus, the complaint likewise fails to state a claim upon which relief may be granted under § 1983 as to Defendant Koch, and he will be **DISMISSED**.

D.      **Defendant Siems**

As to Defendant Siems, Plaintiff first claims that even though this Defendant approved a certain process for inmates in Plaintiff's unit to receive legal copies, she later told Plaintiff that he could not use that process and instead had to get copies from the law library after she spoke to Defendant Koch, even though she knew that Plaintiff was on lockdown and having problems with the library coming to see him [*Id.* at 7–8]. Plaintiff also claims that this Defendant failed to grant his request to move to a different unit despite him telling her that inmates had labelled him a snitch and subjected him to verbal abuse and threats due a grievance he filed that caused this Defendant to fire a unit inmate worker and to not hire any other such worker [*Id.* at 8]. He additionally states that this Defendant attempted to move an inmate who was "a crip" into his cell despite the inmate telling her staff that the inmate and Plaintiff did not get along, and generally alleges that all Defendants except Defendant Koch have subjected him to an excessive and substantial risk of harm [*Id.*]. The Court will address these allegations in turn based on their substance.

1.      **Denial of Access to Courts**

First, the Court liberally construes Plaintiff's allegations that Defendant Siems told him he could no longer get legal copies by completing a withdrawal form despite knowing he was on lockdown and having trouble with the law library to seek relief for denial of access to courts. However, these allegations fail to state a claim for denial of access to courts against Defendant Siems for the same reason they fail to state such a claim against Defendant Koch.

2.      **Failure to Protect Claims**

The Court liberally construes Plaintiff's allegations that Defendant Siems (1) did not grant his request to move to a different unit despite knowing inmates in his unit had labeled him a snitch

13

and subjected him to verbal harassment and threats; (2) attempted to move a "crip" inmate into Plaintiff's cell despite the inmate telling her staff that he and Plaintiff did not get along and would have problems if housed in the same cell; and (3) subjected Plaintiff to an excessive and substantial risk of harm to seek to assert claims for failure to protect in violation of the Eighth Amendment.

It is well-settled that prison officials have a duty to protect inmates from violence by other inmates and to take reasonable measures to protect their safety. *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994). Liability attaches to an officer's failure to protect an inmate only where the inmate demonstrates that he was "incarcerated under conditions posing a substantial risk of serious harm," and that the prison officials acted with deliberate indifference to the inmate's safety. *Id*. at 834. "Deliberate indifference" means that a prison official is liable only where he knows that the inmate faces a substantial risk of serious harm and disregards the risk. *Id*. at 837 (quotation marks omitted). Therefore, in order for liability to attach to a prison official's failure to protect, the substantial risk and need for protection must be obvious. *See, e.g., Adames v. Perez*, 331 F.3d 508, 512 (5th Cir. 2003).

Courts, including the Seventh Circuit, have recognized the inherent risks that a prisoner labeled as a "snitch" faces in prison. *Dale v. Poston,* 548 F.3d 563, 569–70 (7th Cir. 2008). But even after considering these risks, the Seventh Circuit found that the fact that jail officials know that a prisoner has the "snitch" label is only one factor in determining Eighth Amendment liability and insufficient, standing alone, to impose Eighth Amendment liability for a claim for failure to protect. *Id.* at 570. Moreover, "threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." *Varmado-El v. Martin*, 52 F. App'x 764, 765–66 (6th Cir. 2002) (quoting *Prater v. Dahm*, 89 F.3d 538, 541 (8th Cir. 1996)) (finding that a defendant was not deliberately indifferent even where he heard an

argument between cellmates where one called the other "'b*tch' and 'n*gger,' pushed him, and threatened to 'kick his *ss' once they returned to the cell").

First, while Plaintiff alleges that the "crip" inmate told Defendant Siems's staff that the inmate and Plaintiff did not get along and would have problems if housed in the same cell, Plaintiff specifically seeks removal of his security threat group designation from his institutional record as relief in this action, and provides no facts from which the Court can plausibly infer that Defendant Siems's attempt to move the "crip" inmate into his cell amounted to deliberate indifference to his safety. Thus, Plaintiff has failed to "nudge[] [this claim] across the line from conceivable to plausible" as to Defendant Siems. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Plaintiff's allegations that he told Defendant Siems about the snitch label, threats, and verbal abuse from other inmates, and that all Defendants except Defendant Koch have subjected him to an excessive and substantial risk of harm are fairly conclusory to the Court, as he does not set forth any facts about the context of any fellow inmate calling him a snitch or the associated threats and verbal abuse that allow the Court to plausibly infer that these incidents created a substantial risk of harm to his safety to which this Defendant was deliberately indifferent. Nevertheless, as the Sixth Circuit recently specified "that being identified as a 'snitch' in prison puts an inmate at a substantial risk of assault," *Westmoreland v. Butler Cty., Kentucky*, No. 21-5168, --- F.4th ---, 2022 WL 872729, at *6 (6th Cir. Mar. 24, 2022) (citation omitted), and Plaintiff states that Defendant Siems had knowledge that inmates in his unit had labeled him a snitch but still denied his request to move from that unit, the Court will allow this claim to proceed for further factual development.

### 3. Retaliation

Lastly, Plaintiff generally asserts that Defendant Siems's actions were retaliatory [*Id.*]. However, Plaintiff does not specify his factual basis for this claim, and the Court cannot logically

15

interpret any factual allegations from Plaintiff's complaint to state a claim for retaliation upon which relief may be granted under § 1983 as to Defendant Siems. Thus, these allegations fail to state a claim upon which relief may be granted under § 1983 as to Defendant Siems.

## IV. CONCLUSION

For the reasons set forth above:

1. Plaintiff's motion to correct the record [Doc. 4] is **GRANTED** to the extent that the Clerk is **DIRECTED** to correct Defendant Bouldin's name on the Court's docket;

2. Even liberally construing the complaint in favor of Plaintiff, it fails to state a claim upon which relief may be granted under § 1983, except as to his claim that Defendant Siems failed to protect him from the inmates in his unit despite knowing that they had labeled him a snitch and threatened and verbally abused him;

3. All Defendants except Defendant Siems and all claims except Plaintiff's claim that Defendant Siems failed to protect him from the inmates in his unit despite knowing that they had labeled him a snitch and threatened and verbally abused him are **DISMISSED**;

4. The Clerk is **DIRECTED** to send Plaintiff a service packet (a blank summons and USM 285 form) for Defendant Siems;

5. Plaintiff is **ORDERED** to complete the service packet and return it to the Clerk's Office within twenty (20) days of entry of this order;

6. At that time, the summons will be signed and sealed by the Clerk and returned to Plaintiff for service;

7. Plaintiff is **NOTIFIED** that if he fails to timely return the completed service packet, this action may be dismissed;

8. Defendant Siems shall answer or otherwise respond to the complaint within twenty-one (21) days from the date of service. If this Defendant fails to timely respond to the complaint, it may result in entry of judgment by default; and

9. Plaintiff is **ORDERED** to immediately inform the Court and Defendant Siems or her counsel of record of any address changes in writing. Pursuant to Local Rule 83.13, it is the duty of a pro se party to promptly notify the Clerk and the other parties to the proceedings of any change in his or her address, to monitor the progress of the case, and to prosecute or defend the action diligently. E.D. Tenn. L.R. 83.13. Failure to provide a correct address to this Court within fourteen days of any change in address may result in the dismissal of this action.

**IT IS SO ORDERED.**

ENTER:

s/ Leon Jordan
United States District Judge

17

Case 3:22-cv-00011-RLJ-DCP   Document 7   Filed 03/30/22   Page 17 of 17   PageID #: 35